UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Robert A. Kaplus &
Home Buyers "R" Us, LLC,

                    Civ. No. 6:11-cv-285-ORL-35DAB
                    Bankruptcy No: 6:09-bk-04179-ABB

          Appellant,

v.                                  **MEMORANDUM AND ORDER**

Mary Lorenzo,

          Appellee.

---

This matter is before the Court on an appeal from a January 26, 2011, Order ("Order") of Judge Arthur B. Briskman of the United States Bankruptcy Court. This Order found that $67,000.00 provided by Robert Kaplus ("Kaplus") to Debtor Mary Lorenzo ("Lorenzo") was an investment with an equity interest rather than a loan. (Bankr. Docket No. 170.) Kaplus appeals the Bankruptcy Court's Order. (Docket No. 20.) For the reasons that follow, the Order is affirmed.

## BACKGROUND

Lorenzo and Kaplus were social acquaintances for more than twenty-five years. (May 12, 2010, Hr'g Tr. vol. 1, at 86-87.) In February 2006, they met in the Orlando, Florida, area and rekindled their friendship. (Id. at 10, 87.) At the time, Lorenzo was successfully selling timeshares. (Id. at 9.) Lorenzo and Kaplus began meeting frequently and discussed investing in real estate together. (Id. at 10.)

During the discussions, Lorenzo mentioned that she had been offered a real estate investment opportunity by Don Crupi, a/k/a Don Crupie ("Crupi"). (Id. at 21.) Crupi's investment opportunity involved an entity named BTB Consulting ("BTB"). (Id.) Lorenzo explained to Kaplus that she had learned that BTB's program allowed investors to purchase houses for a lower price, and BTB would provide pre-approved buyers to subsequently purchase the houses for a higher price. (Id. at 72-73.) Under BTB's plan, Lorenzo and Kaplus thought they would make a profit of approximately $250,000 to $300,000.00. (Id. vol. 2, at 9.) BTB and Crupi collected consulting fees from the arrangement. (Id. vol. 1, at 75.) Lorenzo had three acquaintances who profited through the BTB program. (Id. at 73.) Lorenzo wanted to participate as well, but she did not have enough capital for the initial investment. (Id.)

Lorenzo sought to convince Kaplus to provide the necessary capital for them both to join the BTB program. (Id. at 11.) Kaplus met with Crupi and Lorenzo and asked Crupi numerous questions about the program. (Id. at 74.) While Kaplus was considering Lorenzo's proposals, he left Florida to vacation in Colorado. (Id. at 13.) During his vacation, Kaplus received several faxed documents from Lorenzo that were prepared by BTB. (Id. at 14.) The prepared agreement Lorenzo faxed Kaplus stated that Kaplus would get "50 percent of the profit from this proposed venture." (Id. at 16.) Kaplus never signed this agreement, but on March 15, 2006, Kaplus wired $67,000.00 to Real Estate Investors Today, a company controlled by Lorenzo. (Id. at 23.) Kaplus's wiring instructions explained that the $67,000.00 was an "investment loan." (Id. vol. 2, at 16.)

When Kaplus wired the money, he expected Lorenzo would use it to invest in BTB. (Id. at 73.)

After receiving the wired funds from Kaplus, Lorenzo invested the $67,000.00 with BTB. (Id. vol. 1, at 74.) BTB had initially promised Lorenzo and Kaplus they could invest in three properties, but those properties had already been sold to another investor by the time Kaplus wired the money. (Id. at 76-77.) BTB returned the $67,000.00 to Lorenzo, and she used a portion of the $67,000.00 to purchase a different property through BTB with Crupi's mother. (Id. at 23.) After purchasing the property, BTB began giving Lorenzo "the run-around" and never finalized the promised resale to its list of promised buyers. (Id. at 79.) Lorenzo relayed her concerns to Kaplus, and he demanded his money back. (Id.) Lorenzo promised to repay the money. (Id. at 80.) However, Lorenzo never returned any of the $67,000.00 to Kaplus. (Id. vol. 2, at 30.)

Simultaneously with their attempts to recoup their money from BTB, Kaplus and Lorenzo continued to seek real estate opportunities together. (Id. vol.1, at 30.) In May 2006, they agreed to create a limited liability company to purchase, improve, and resell distressed houses for profit. (Id. at 82-83.) Kaplus and Lorenzo signed a document ("Nominee Agreement"), and both expected to write a more formal agreement. (Id. at vol. 2, 34, 81.) The Nominee Agreement stated "[Kaplus] and [Lorenzo] each own fifty percent of the company." (Id. at 75-76.) Kaplus assured Lorenzo that he was going to create a new company to comply with the Nominee Agreement, but he never actually did so. (Id. at vol. 1, 82.) Instead, Kaplus and Lorenzo operated entirely through Kaplus's company Home Buyers 'R' Us ("HBRU"). (Id. at vol. 2, 26, 100.) Lorenzo later learned

3

that she was never added as a partner on any of the documents and that she did not own one-half of the company as the Nominee Agreement required. (Id. at 81, 91.) In fact, Lorenzo did not have access to any bank accounts of the company. (Id. vol. 2, at 38.) According to their plan, Kaplus would provide the capital to purchase the houses while Lorenzo performed the daily legwork in executing their plan. (Id. vol. 1, at 26.)

Shortly before HBRU purchased its first house, Kaplus decided that Lorenzo would personally mortgage each property. (Id. at 45.) Kaplus convinced Lorenzo that this switch would allow them to purchase more properties because she had stronger credit. (Id. at 84.) Lorenzo would then transfer the titles of the houses to a trust on behalf HBRU, and HBRU would make the mortgage payments. (Id. vol. 2, at 84-85.) Kaplus and Lorenzo also agreed that HBRU would pay Lorenzo a regular salary of $10,000.00 per month in order to allow her to devote her time and attention to all of HBRU's activities. (Id. vol. 1, at 84.) HBRU paid Lorenzo $40,000.00 for the months of July, August, September, and October 2006. (Id. at 51-52.)

HBRU ultimately purchased five houses in 2006. (Id. at 50, 105.) Lorenzo borrowed approximately $800,000.00 on her own credit expecting to have Kaplus continue to pay the mortgages. (Id. at 83.) Kaplus never signed onto any of the titles. (Id. at 84.) During this time, Lorenzo sought the ideal houses to purchase. (Id. vol. 2, at 43.) Kaplus would not inspect the houses personally before Lorenzo purchased them. (Id.) HBRU made $124,754.72 in down payments for the five properties. (Id. at 50.)

After HBRU purchased the houses, Lorenzo oversaw the renovations of each house. (Id. at 60, 98.) Initially, Kaplus planned to finance the house renovations in

advance, but he changed his mind and required Lorenzo to make the payments on her American Express credit card ("AMEX"). (Id. vol. 1, at 52.) Lorenzo then submitted her AMEX statement to Adalzira Diez ("Diez"), Kaplus's accountant, for reimbursement. (Id. vol. 2, at 60-61.) Either Kaplus or Diez would reimburse Lorenzo only for purchases on her AMEX statement documented with valid receipts. (Id. vol. 1, at 99-102; vol. 2, at 61, 69.) ("If I didn't have a document, I didn't pay it.") Kaplus provided to HBRU the money Diez used to reimburse Lorenzo. (Id. vol. 1, at 52-53, 99.)

Beginning in October 2010, Kaplus began waiting until the last possible date each month before making the mortgage payments on Lorenzo's behalf. (Id. at 84-85.) When Lorenzo asked why he was delaying, Kaplus demanded the BTB repayment. (Id. at 85.) In December 2006, under Kaplus's direction, HBRU ceased making mortgage payments, payments to contractors, and reimbursements to Lorenzo. (Id.)

On March 31, 2009, Lorenzo filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. (Bankr. Docket No. 1.) On June 19, 2009, Kaplus filed Proof of Claim 23-1 ("Claim") in Bankruptcy Court for the $67,000.00 that he claims was owed him by Lorenzo. (Docket No. 20 at 2.) On July 15, 2009, Lorenzo filed an objection to the Claim. (Bankr. Docket No. 99.) On August 13, 2009, Kaplus filed a response to Lorenzo's objection to the Claim. (Bankr. Docket No. 115.)

On July 20, 2009, Kaplus sued Lorenzo in an adversary proceeding within Lorenzo's bankruptcy case seeking to determine that certain debts, including the Claim, were "non-dischargeable" pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4) ("Adversary Proceeding"). (Bankr. Docket No. 101; Adversary Proceeding Docket No. 1.) On May

5

12, 2010, the Bankruptcy Court conducted an evidentiary hearing in the Adversary Proceeding. (Docket No. 20, Tab 2 at 1.) The Bankruptcy Court then issued a Memorandum Opinion and Order and Judgment in favor of Lorenzo holding that the debt owed to Kaplus in the Claim was dischargeable. (Adversary Proceeding Docket No. 31.)

On October 26, 2010, the Bankruptcy Court held a hearing in Lorenzo's main bankruptcy case on her objection to the Claim. (Docket No. 20 at 3.) The Bankruptcy Court recognized that the sole issue litigated in the Adversary Proceeding was the dischargeability of two debts, including the Claim. (Id.) After this hearing, the Court entered the Order from which Kaplus now appeals. (Bankr. Docket No. 170.) The sole issue on appeal is whether the Bankruptcy Court properly classified the $67,000.00 in dispute in the Claim as a contribution in equity rather than as a loan.

## DISCUSSION

### A. Standard of Review

Upon entry of a final order by the bankruptcy court, a party may appeal to the district court pursuant to 28 U.S.C. § 158(a). The district court functions as an appellate court in reviewing decisions of the bankruptcy court, reviewing its legal conclusions de novo and employing the clearly erroneous standard in reviewing its findings of fact. In re Colortex Industries, 19 F.3d 1371, 1374 (11th Cir. 1994). The standard of review employed by this Court in reviewing the bankruptcy court's findings of fact is the clearly erroneous standard of review described in Federal Rule of Bankruptcy Procedure 8013: "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the

bankruptcy, court to judge the credibility of the witnesses." See also In re Thomas, 883 F.2d 991, 994 (11th Cir.1989), cert. denied, 497 U.S. 1007 (1990) (interpreting Fed. R. Bankr. P. 8013). This court may not make independent factual findings. In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Corp., 333 U.S. 364, 395 (1948). The party seeking to overturn the Bankruptcy Court's findings bears the burden of showing clear error. In re Caribbean K Line, Ltd., 288 B.R. 908, 911 (S.D. Fla. 2002).

**B. Analysis**

A party may make a claim in a bankruptcy estate as a creditor for any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5)(A). Once a party files a claim, the claim is deemed allowed unless a party in interest objects. Id. § 502(a). If an objection is made, the objector bears the burden to produce evidence sufficient to negate the validity of the claim. In re SFD @ Hollywood, LLC, 411 B.R. 788, 792 (Bankr. S.D. Fla. 2009) (citing In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992)). If the objector succeeds, the burden shifts back to the claimant to prove the validity of the claim by the preponderance of the evidence. Id. (citing Allegheny Int'l, Inc., 954 F.2d at 174).

The Bankruptcy Court held an evidentiary hearing on Lorenzo's objection to Kaplus's claim. In this hearing, Kaplus testified that he wired $67,000.00 to Lorenzo

with the expectation that she would invest the money in BTB. (May 12, 2010, Hr'g Tr. vol. 2, at 73.) Prior to wiring the money, Kaplus knew about the BTB program and had an understanding of what Lorenzo planned to do with the money. In addition, evidence was developed to demonstrate that the parties subsequently entered into an agreement to form a partnership with joint, equal ownership.

The transcript from the Bankruptcy Court's evidentiary hearing demonstrates that the Bankruptcy Judge's determination on the issue before him was influenced greatly by the credibility, or lack thereof, of the witnesses who testified at the hearing. In fact, at the close of Kaplus's testimony, Judge Briskman told him:

> [M]ost of your answers today have indicated that you're trying to control the dialogue, that you're trying to put your spin on every area, and you didn't directly answer most of the questions and that's why I asked you several times to do that. . . . So I really would like you to be honest with me because I'm the one making the decision. Do you understand that?

(Id. at 103.) Judge Briskman asked Kaplus several more questions while attempting to determine Kaplus's relationship with Lorenzo. On each occasion, Kaplus deflected the question, further exacerbating Judge Briskman's frustration. (See e.g., id. at 104 ("I'm trying to find out from your side, your point of view, and you want to control the dialogue, you don't want to answer my questions directly.").) After hearing this testimony and reviewing all of the evidence, the Bankruptcy Court determined that Kaplus's contentions were not credible, and decided that the money at issue was an investment rather than a loan and, as such, was dischargeable in Lorenzo's bankruptcy proceeding.

This Court may not set aside the Bankruptcy Court's findings of fact, whether based on oral or documentary evidence, unless such findings are clearly erroneous. Further, this Court must give due regard to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses. There are more than sufficient facts in the record to support the Bankruptcy Court's findings that the $67,000.00 transferred to Lorenzo on March 15, 2006, was an investment with an equity interest rather than a loan. That decision is therefore affirmed.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that the order of the Bankruptcy Court is **AFFIRMED**, and the appeal is **DISMISSED**.

**The Clerk shall enter judgment accordingly, transmit a copy of this Order and the Judgment to the Clerk of the Bankruptcy Court, terminate the appeal, and close the file.**

Dated:   February 8, 2012

                                                     *s/Paul A. Magnuson*
                                                     Paul A. Magnuson
                                                     United States District Court Judge